* * * * * * * * * * *
The Full Commission reviewed the prior Opinion and Award, based upon the record of the proceedings before Deputy Commissioner Taylor and the briefs and oral arguments before the Full Commission. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; or amend the Opinion and Award, except for minor modifications. Accordingly, the Full Commission affirms the Opinion and Award of Deputy Commissioner Taylor with minor modifications.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties as: *Page 2 
 STIPULATIONS AND EXHIBITS
1. All parties are properly before the Industrial Commission.
2. On 16 September 2002 an employee-employer relationship existed between Plaintiff and Defendant.
3. On 16 September 2002, the self-insured Defendant was on the risk for any liability asserted against Defendant arising under the North Carolina Workers' Compensation Act.
4. The parties are subject to and bound by the Worker's Compensation Act codified in N.C. General Statutes Chapter 97.
5. The Industrial Commission has subject matter and personal jurisdiction over the parties to this action and the claims asserted herein.
6. All parties are correctly designated, and there is no question as to misjoinder or nonjoinder of parties.
7. The Plaintiff's last day of work for the Defendant was on 16 September 2002.
8. The Plaintiff's average weekly wage is $658.42, yielding a compensation rate of $438.97. The remainder of the Pre-Trial Agreement is hereby incorporated by reference.
9. The parties stipulated to 80 exhibits at hearing before the Deputy Commissioner, to include the pre-trial agreement. Exhibits #1-77 were submitted in three notebooks. Stipulated exhibit #78 is a confidentiality agreement with photos taken at the Tyson Facility; Stipulated Exhibit #79 are the boots the plaintiff was wearing on 16 September 2002 and Stipulated Exhibit #80 is a pair of illustrative boots just like the boots the plaintiff was wearing on 16 September 2002. *Page 3 
10. The parties further stipulated to the plaintiff's medical records which were submitted in two notebooks and which are marked Stipulated Medical Records A through K.
11. Plaintiff's exhibits A through J, plaintiff's N, O and P, and the plaintiff's R through BB were admitted by stipulation. These exhibits were submitted in two separate notebooks prepared by the plaintiff. During the hearing, plaintiff's exhibits L and CC were also admitted into evidence.
12. On 23 September 2004, the defendants submitted the plaintiff's Social Security records as a stipulated exhibit. The records were inadvertently given two different stipulated exhibit numbers. At hearing, these records were marked as Stipulated Exhibit #76, but at the time of the 23 September 2004 submission these records were marked as Stipulated Exhibit #81. For purposes of this decision, these records will be referred to as plaintiff's Social Security records.
13. Rulings with regard to the admission of plaintiff's exhibits K, M and Q were held in abeyance.
 * * * * * * * * * * * RULINGS ON OBJECTIONS AND ADMISSION OF EXHIBITS
1. With regard to the plaintiff's request for the admission of plaintiff's exhibit KK and MM, the depositions of Michael Hicks, John Bass and Dr. Sane were duly submitted with the Industrial Commission and already admitted into evidence in this matter. A separate admission is not required.
2. Exhibits DD, EE, PP, UU, VV, WW and XX are admitted into evidence. It is further noted that the defendant's responses to the plaintiff's third set of interrogatories were stipulated into evidence as stipulated exhibit #30. *Page 4 
3. The Deputy Commissioner found, and the Full Commission so finds, no relevance to plaintiff's exhibits marked YY and LL as depositions of Dr. Berger and Michael Hicks were taken and duly admitted into evidence.
4. Documents marked as plaintiff's exhibit ZZ and AAA were admitted into evidence through Dr. Berger's deposition testimony and do not require separate admission.
5. Plaintiff's exhibit KK is admitted into evidence.
6. Plaintiff's exhibit FF was authenticated by Michael Hicks during his deposition and is accepted into evidence.
7. Plaintiff's exhibit MM as it refers to exhibits attached to the deposition of Mr. John Bass is admitted into evidence.
8. Plaintiff's exhibit MM as it refers to exhibits attached to the deposition of Dr. Sane is admitted into evidence.
9. Plaintiff's exhibits OO and RR are admitted into evidence, and the issues of payment of John Bass's fee and Dr. Berger's fees are addressed in the body of this Opinion and Award.
 * * * * * * * * * * *
Based upon the credible evidence of record and reasonable inferences drawn therefrom, the Full Commission finds as fact the following:
 FINDINGS OF FACT
1. On September 16, 2002, the plaintiff was a 29-year-old male who was employed as a machine operator in the maintenance division of the Packing Department at the Tyson Foods Roasted Products Plant in North Wilkesboro, North Carolina. *Page 5 
2. The plaintiff has a 12th grade education and was initially hired by Tyson Foods in 2001. He has worked in the maintenance department of Tyson Foods for five to six years. During this time he worked with several machines and worked with Linx printers for one to two years. He does not recall any of the events of September 16, 2002. The first thing he remembers is waking up in a rehabilitation hospital about September 16, 2002 and after.
3. One of the plaintiff's supervisors was Dean Eller. Mr. Eller has been employed by Tyson Foods for twenty-seven years and has worked as a group leader in Packing and Maintenance since approximately 1995-1996. He holds the same position as the plaintiff, "machine operator," but has more experience and also has supervisory responsibility of other employees, including the plaintiff. Mr. Eller is familiar with Linx 6200 Inkjet printers and works to keep machines running at the Tyson Roasted Products facility. The Full Commission finds Mr. Eller's testimony to be credible.
4. Linx 6200 Inkjet printers are manufactured by Linx. Tyson Foods purchased six or seven Linx 6200 Inkjet printers in 2001 from a vendor, the Diagraph Corporation. The Linx 6200 Inkjet printer provides a means of application of printed information onto a wide range of products. This information would typically be the date, production codes, consumer information, product or corporate identification, product traceability, product ingredients and many more. The printer is normally fixed to a production line in such a way that printing takes place as the product passes the printhead. The printer consists of a cabinet and a printhead. The cabinet houses the electronics module, the ink system and a power supply. The printhead is attached to the rear of the cabinet via a flexible conduit. The printhead has a built-in safety interlock system wherein, when the cover of the printhead is removed for cleaning purposes or any other purpose, *Page 6 
electricity is not present on the printhead. The printhead is specifically designed for industrial environments.
5. The Tyson facility where the plaintiff worked used the Linx printers to print the "sell by" date on chicken packages.
6. Tyson Foods has a "User Manual" for the Linx printers, but does not have a complete copy of the "Service Manual" for the Linx printers. The only portion of the "Service Manual" that Tyson has is a section that provides information regarding parts. Tyson uses this portion of the manual to assist in ordering parts for the printers from Diagraph.
7. When Tyson employees needed help with repairs, they called the Diagraph Corporation. If Diagraph could not walk Tyson employees through the repair, they would send a repairman to Tyson to perform the repair.
8. Michael Hicks worked as a field service technician for the Diagraph Corporation and he helped Tyson install the Linx Inkjet printers at their facility. He also trained Tyson employees regarding how to use the Linx Inkjet printer and basic maintenance training such as nozzle clearing, gutter clearing and wrenching the printhead off. While the plaintiff does not recall receiving training from Mr. Hicks. Plaintiff's various co-workers including Chris Johnson and Dean Eller indicated Mr. Hicks provided training to the plaintiff.
9. The Linx 6200 Inkjet printer is equipped with a built-in interlock safety system in the printhead. In order to clean the printhead, the cover must be removed. The cover is approximately eight inches long and has an imbedded magnet in the front end of it. When the cover is removed to the space of one-eighth of an inch, the power is disconnected on the inside. Thus, when the cover is removed there is no voltage on the printhead. This is a built-in interlock *Page 7 
safety system designed by Linx to ensure that no voltage is present on the printhead when the cover is removed.
10. The Linx 6200 Inkjet printer that the plaintiff was working with on 16 September 2002 had serial number/manufacturer's number MD0125008.
11. As a maintenance employee, the plaintiff was responsible for maintaining Linx 6200 Inkjet printers. He performed a variety of maintenance tasks with regard to these printers, including performing nozzle clears and cleaning the printhead to remove ink clogs.
12. The Linx Inkjet printer is prone to ink blockages and the User Manual provides information for the user regarding how to clean ink blockages out of the printer.
13. Generally, an ink blockage occurs in the printhead in the nozzle or the gutter areas. The ink blockage can be cleaned by squirting solvent on the printhead or by running a Clear Nozzle Sequence. In order to clean the printhead, General Purpose Solvent 1505 is used. This is a solvent manufactured by Linx.
14. Cleaning the printhead of the Linx 6200 Inkjet printer is a routine maintenance procedure and one that was routinely performed by the plaintiff during his employment with Tyson.
15. The floor in the room where the plaintiff was working on 16 September 2002 was damp, but this was normal, as this is a "clean room," and is washed down every night. Tyson maintenance employees wear rubber boots while they are in this room, and the plaintiff was wearing rubber boots on 16 September 2002. These rubber boots provided additional insulation to prevent the plaintiff and other employees from receiving an electrical shock.
16. When Mr. Eller arrived at work on September 16, 2002, he asked the plaintiff how it was going and the plaintiff said that it "was about like normal." At that time, the plaintiff *Page 8 
was performing a nozzle clear, or cleaning the printhead of his Linx 6200 Inkjet printer on Line 6. Mr. Eller proceeded to his printer and began to clean the printhead of his Linx 6200 Inkjet printer. Although Mr. Eller was standing approximately twenty to thirty-five feet from the plaintiff, his back was to the plaintiff and he did not see the plaintiff collapse. The last thing he saw the plaintiff doing before he realized that the plaintiff had collapsed was performing a nozzle clear.
17. Chris Johnson also works for Tyson Foods as a machine operator and he was cleaning a printhead on his Linx 6200 Inkjet printer on September 16, 2002. He was standing approximately 100 feet from the plaintiff, but he did not see the plaintiff collapse to the floor. The Full Commission finds Chris Johnson's testimony to be credible.
18. Regina Wood works at Tyson in the Labeling Department. On September 16, 2002, she was walking to her worktable and saw the plaintiff standing by the line. She saw the plaintiff fall and he didn't have anything in his hands when he fell. She indicated that it was just like plaintiff's knees went out from under him. She did not hear any shouts or sounds from the plaintiff. The plaintiff was not flinging his arms when he fell. While Ms. Wood saw the plaintiff start to fall, she did not see the plaintiff actually come into contact with the ground. The Full Commission finds Ms. Wood's testimony to be credible.
19. When it became apparent that the plaintiff had collapsed, employees contacted the nurse, Rebecca Houck. The plaintiff appeared to be having seizures and was acting as though he was trying to get some air. When Rebecca Houck arrived on the scene, the plaintiff did not have a pulse, he had no respirations, his pupils were non-reactive and his face was cyanotic. There was no indication that the plaintiff had any burns on his hands. Rebecca Houck and other employees including Jimmy Pipes and Tony Gregory performed CPR until EMTs arrived at the *Page 9 
facility. The exact time of the plaintiff's collapse is unknown, but by all accounts, first responders arrived quickly.
20. After the plaintiff was taken to Wilkes Regional Medical Center, Edgar Harris, the maintenance manager, requested Dean Eller and Alvin Nichols to look into the situation to make sure that everything around the plaintiff's work area was okay. He requested Mr. Nichols to test the plaintiff's printer.
21. Alvin Nichols has been employed by Tyson Foods for approximately twenty-eight years. For the last sixteen years he has worked as the lead electronics person. His duties include care and upkeep of electronic and electrical equipment in the plant. He has an associates and applied degree in electronics from Wilkes Community College. Mr. Nichols's immediate supervisor is Edgar Harris. The Full Commission finds Mr. Nichols's testimony to be credible.
22. Mr. Eller asked Mr. Johnson to get the plaintiff's printer up and running immediately after plaintiff was transported to the hospital. Mr. Johnson went to the plaintiff's work area and did not find anything out of place or in disarray. He did not see any hazardous conditions or notice anything out of the ordinary. There was a nut driver, a bottle of solvent and the printhead cover lying together on the line. The printhead was hanging in the trashcan, which was normal when the printhead was being cleaned. There were no excess tools lying around.
23. Mr. Johnson continued to clean the printhead and got the printer started as usual in approximately five to ten minutes. The printer was then taken to Mr. Nichols's shop where he tested the printer with a fluke voltmeter for approximately three hours. Mr. Nichols was only able to detect background voltage, which will always be found with a voltmeter when electrical equipment is in operation. Mr. Nichols was unable to find any evidence of failure of the built-in interlock safety system of the printhead, nor did he find any evidence of a ground fault or a short *Page 10 
in the printhead. Because nothing was found to be wrong with the printer, it was returned to service later in the day on September 16, 2002.
24. At some point after September 16, 2002, Dean Eller asked Mr. Hicks if someone could get shocked from the Linx 6200 Inkjet printer, and Mr. Eller specifically questioned Mr. Hicks about the plaintiff's printer and showed him the plaintiff's printer. Mr. Hicks went to the Tyson plant and looked at the plaintiff's printer. He checked all the earth-ground connections and they were all in place. Mr. Hicks did not find anything wrong with the plaintiff's printer.
25. When EMS personnel arrived at Tyson Foods on September 16, 2002, the plaintiff was lying supine on the floor and CPR was in progress. The plaintiff was pulseless and in ventricular fibrillation and the assessment was cardiac arrest. Plaintiff was transported to the Wilkes Regional Medical Center Emergency Department. He was diagnosed with cardiac arrest that had led to anoxia. There was no report that the plaintiff had been exposed to an electrical shock or had experienced any other type of injury at work.
26. The plaintiff was transferred to Baptist Hospital on September 16, 2002, to the Coronary Care Unit suffering from (1) ventricular arrhythmias of unknown etiology; (2) convulsions secondary to arrhythmia, or primary to arrhythmia, or ventricular arrhythmia which resulted in hypoxic or anoxic encephalopathy resulting in hypoxic seizure; (3) possible myocardial infarction; (4) possible anoxic brain injury; (5) respiratory failure, and (6) hematuria, most likely thought to be glomerulonephritis ischemic in nature.
27. Plaintiff's cardiac catheterization on September 16, 2002, revealed normal coronary arteries. Plaintiff was discharged from Baptist Hospital to Carolina Rehabilitation in Charlotte, North Carolina on October 16, 2002, with discharge diagnoses of sudden cardiac arrest, ventricular fibrillation, Brugada syndrome, anoxic brain injury, seizures, respiratory *Page 11 
failure status post intubation and mechanical ventilation now status post tracheostomy, gastrointestinal hemorrhage secondary to rectal ulcer, history of aspiration pneumonia, left upper extremity deep venous thrombosis and history of thrombophelbitis, resolved.
28. Plaintiff was admitted to the Charlotte Institute of Rehabilitation on October 16, 2002, and was discharged on November 27, 2002. Diagnosis upon discharge was anoxic encephalopathy. The plaintiff was not to drive, drink alcohol, smoke tobacco or operate heavy machinery, power tools or climb until cleared by his physician. He was to participate in physical therapy for eight to ten weeks, occupational therapy for eight weeks and speech therapy for twelve to fourteen weeks.
29. Plaintiff was evaluated by Dr. Kenny Hefner with Medical Associates of Wilkes on December 27, 2002. Dr. Hefner's diagnoses were status post cardiac arrest due to Brugada syndrome with mild persisting neurologic deficits.
30. From December 2002 through February 2004, the plaintiff participated in outpatient occupational and speech therapy, memory exercises and physical therapy at Wilkes Regional Medical Center Department of Rehabilitation Services.
31. The plaintiff applied for Social Security disability benefits on January 15, 2003. Neither the plaintiff nor his wife indicated that the plaintiff had received any type of electric shock injury. Rather, they indicated that the plaintiff stopped working due to experiencing a cardiac arrest that resulted in brain injury.
32. Harry G. Padgett, Ed.D., with the Agape-Onoma Psychological Center evaluated the plaintiff in connection with his Social Security Application. He concluded in his report that it was unknown as to whether the plaintiff was electrocuted. On June 11, 2003, the plaintiff was deemed disabled for purposes of the Social Security Administration as of September 16, 2002, *Page 12 
due to the primary diagnosis of organic mental disorders (chronic brain syndrome) and the secondary diagnosis of Epilepsy.
33. A medical note from Baptist Hospital dated January 14, 2003, is the first indication in the plaintiff's medical records that there was any concern regarding whether the plaintiff had received an electric shock from working on a printer. However, even this medical note indicates that there was no definite evidence that he had received a shock and the ultimate medical assessment on this date was sudden cardiac death, etiology not clear.
34. The plaintiff underwent internal cardiac defibrillator (ICD) placement on January 21, 2003, and the competent, persuasive medical evidence of record establishes that the placement of an ICD is treatment that would not be provided to someone who had experienced a one-time electrical shock injury. Rather, this treatment is consistent with someone who has idiopathic ventricular fibrillation. Likewise, the plaintiff's physicians treated him with a course of Amiodarone, which is a very powerful antiarrhythmic drug. It is effective in many cases in preventing dangerous ventricular fibrillation and also atrial arrhythmias. However, it has significant toxicity, including a condition known as Amiodarone pulmonary toxicity, which can be fatal. It is a drug that is used in patients with dangerous arrhythmias. The record shows that is not a treatment that is consistent with a one-time electrical shock injury.
35. At hearing before the Deputy Commissioner, the plaintiff presented testimony from his wife who indicated that she does not believe that the plaintiff will be able to return to work due to difficulty using his hands, difficulty with balance, frustration, and back pain.
36. The defendant also took testimony from the plaintiff's father at hearing. He testified that he himself had undergone triple bypass surgery in August of 2003 and that he has a heart condition that causes his heart to "run away," or speed up really fast. He testified that he *Page 13 
advised the plaintiff's physicians of his heart problems. Plaintiff's father does not believe that the plaintiff will be able to return to work.
37. Defendant retained Dr. Thomas Jay Berger, a cardiologist, to review and evaluate the plaintiff's medical records. Dr. Berger is board-certified in thoracic surgery, the appropriate area of certification for a cardiac surgeon and board certified in the field of forensic medicine. He has extensive experience as a practicing cardiologist and over the course of his career Dr. Berger has treated thousands of patients with cardiovascular conditions. The defendant tendered Dr. Berger as an expert in the field of cardiology, thoracic surgery and forensic medicine.
38. Dr. Berger conducted a medical records review in this matter and prepared a report dated September 10, 2004, as well as supplemental reports entitled Significant Points and Support From The Literature and Comments On John Bass's Report In The Case Of Holloway v. Tyson Foods to document his findings and opinions. Dr. Berger conducted a review of the plaintiff's medical records, Social Security records, statements and depositions from Regina Wood and Chris Johnson, reports from John Bass and Tom Copeland as well as photographs associated with those reports. He also reviewed outside sources including "Electrical Injuries," fromCritical Care Medicine prepared by Koumbourlis; "The Brugada Syndrome," in the American Journal of Emergency Medicine; Heart Disease: A Textbookfor Cardiovascular Medicine and "Brugada Syndrome: 1992-2002 A Historical Perspective," from the Journal of the American College ofCardiology. He reviewed these outside references and scientific literature to assist in determining the cause of the plaintiff's cardiac arrest, particularly whether it was related to anything that he was doing at work. However, the outside references were not used in forming his medical opinions, but rather they were used to illustrate that Dr. Berger's medical opinions are consistent with the beliefs that are generally held in the relevant medical *Page 14 
community. Dr. Berger's medical opinions are based on his own training, experience and knowledge.
39. With regard to the plaintiff's course of medical treatment, Dr. Berger commented that testing showed that the plaintiff's ejection fraction was only 30% and it should normally be 50%. He indicated that this finding was consistent with someone who had just recovered from an episode of ventricular fibrillation and resuscitation. There was also evidence of some premature ventricular contractions on the plaintiff's admission to Baptist Hospital as evidenced by EKGs even while the plaintiff was taking Amiodarone, an antiarrythmic drug. Dr. Berger indicated that this showed that the plaintiff had a tendency to ventricular irritability and that he continued to have it after the arrest. In Dr. Berger's opinion, the fact that the plaintiff's physicians continued to treat him with Amiodarone is evidence that they felt he had experienced an episode of idiopathic ventricular fibrillation.
40. The plaintiff's physicians treated him with the placement of an ICD on January 14, 2003. An ICD is basically a pacemaker. It senses if the patient has tachycardia and if tachycardia is sensed, the ICD delivers a shock to defibrillate the heart. These shocks can be painful and if they hit at the wrong time, they can be potentially dangerous. In Dr. Berger's expert opinion, the placement of an ICD and treatment with Amiodarone would be below the standard of care if the patient truly had just experienced a one-time electrical shock injury. Rather, this treatment is more consistent for someone who has experienced an episode of ventricular defibrillation.
41. With regard to the general consensus of the plaintiff's physicians regarding a diagnosis, Dr. Berger indicated that none of the plaintiff's physicians said that they thought the plaintiff's condition was due to a shock. He indicated that Dr. Holshouser's impression was *Page 15 
"episode of sudden cardiac death," and Dr. Fitzgerald's impression was "sudden cardiac death, etiology not clear." When the ICD was placed it was because of "prior sudden cardiac arrest and ventricular fibrillation." None of the plaintiff's physicians ever said that they believed the plaintiff's condition was due to an electrical shock. It is Dr. Berger's opinion that if they had thought that, they would not have placed the ICD.
42. Dr. Berger opined to a reasonable degree of medical certainty, and the Full Commission finds as fact, that plaintiff experienced an episode of idiopathic ventricular fibrillation and that the idiopathic ventricular fibrillation was not caused by an electric shock.
43. Dr. Berger testified that there was no evidence that the plaintiff experienced respiratory arrest due to inhalation of MEK and that his symptoms were more consistent with an episode of ventricular fibrillation, seizures and apnea due to the brain not getting enough blood. Dr. Berger opined to a reasonable degree of medical certainty, and the Full Commission finds as fact, that exposure to MEK did not cause the plaintiff to experience cardiac arrest. It was also Dr. Berger's opinion that the plaintiff experienced brain damage after the EMS crew arrived at the plant, but he did not testify that to a reasonable degree of medical certainty, that any of the plaintiff's job duties or activities in the work environment caused the plaintiff's brain damage.
44. Dr. David Sane, an attending cardiologist at North Carolina Baptist Hospital, assumed care of the plaintiff at some point during the plaintiff's one month stay at North Carolina Baptist Hospital. Given the plaintiff's condition upon admission, it was Dr. Sane's opinion that the plaintiff was "one of the most remarkable cases [he's] ever seen, in terms of recovery."
45. Dr. Sane and Dr. Berger both explained that "idiopathic" means the cause of a condition is unknown. Dr. Sane indicated that "idiopathic ventricular fibrillation" would mean that a physician sees ventricular fibrillation, but cannot explain its origin. *Page 16 
46. Dr. Sane agreed that Amiodarone is an anti-arrhythmic drug and used in people who have had ventricular arrhythmias, ventricular tachycardia, or ventricular fibrillation. While Dr. Sane testified that an electric shock can cause ventricular fibrillation and cardiac arrest and that nothing in the plaintiff's medical records eliminated the possibility that electric shock was a cause of the plaintiff's cardiac arrest, he agreed that he did not know what caused the plaintiff to go into ventricular fibrillation. Dr. Sane also indicated that he was speculating when he testified that plaintiff could have suffered cardiac arrest due to an electrical shock and he confirmed that he had not been presented with any evidence that the plaintiff had been exposed to an electrical shock on 16 September 2002.
47. The defendant retained Tom Copeland, electrical engineer with The Warren Group, to conduct an inspection of the plaintiff's printer in this matter. The Warren Group is a Columbia based group of forensic engineers and consultants. Prior to working for the Warren Group, Mr. Copeland worked as an electrical engineer for the Eastman Chemical Company for approximately thirty-five years.
48. In connection with his investigation, Mr. Copeland reviewed the plaintiff's medical records; co-workers' statements including Alvin Nichols, Dean Eller, Rebecca Houk, Chris Johnson; prehearing depositions from Regina Wood, Dean Eller, Alvin Nichols and William Edgar Harris; a maintenance job description; Industrial Commission forms; prehearing discovery to the defendant; prehearing discovery to the plaintiff; photographs, the 6200 Linx inkjet printer User's Manual; the 6200 Linx inkjet printer maintenance instruction; MSDS for *Page 17 
1505 solvent and a Service Manual. He did not have access to the Service Manual at the time that he went to Tyson to conduct his inspections because Tyson did not have a copy of the Service Manual. Mr. Copeland also reviewed the pair of boots that the plaintiff wore on the date of injury and a report prepared by John Bass.
49. Mr. Copeland visited the Tyson Foods facility on two occasions. The first trip was on July 14, 2004, and the second trip was on July 26, 2004. Mr. Copeland was advised that the printer the plaintiff was using on the date of the event was the Linx Ink jet printer with serial number MD0125008. Tyson employees including Alvin Nichols and Edgar Harris helped Mr. Copeland identify the printer that needed to be tested.
50. On July 14, 2004, the plaintiff's printer was connected to a line adjacent to the line where it had been on September 16, 2002. On Mr. Copeland's second visit on July 26, 2004, the printer was on the line where the plaintiff had been working on September 16, 2002. During both visits, the printer was clean and looked well maintained and was capable of working on the line on either occasion.
51. Mr. Copeland confirmed that the printhead has an interlock safety system so that once the cover is removed, it turns the power off to the internal parts of the printhead. As soon as the cover is removed, it shuts the power off to the printhead. This is a safety system that was designed by the manufacturer.
52. Mr. Copeland tested the printer with serial number MD0125008 by testing the printhead itself to ground with the power on and the power off. He then removed the printhead cover and tested every point that he could find inside the opened up printhead for voltage. He went through the cleaning procedure while he tested for voltage. He sprayed solvent, he used the re-circulating pump, and went through the same series of events that the plaintiff would have *Page 18 
performed on September 16, 2004. He performed all of these tasks while he continued to measure for voltage and looked for anything that could have been wrong with the printer. Mr. Copeland could not find anything wrong with the printer.
53. Mr. Copeland also tested all of the equipment around the printer where the plaintiff would have been working to determine if it was grounded and he found that the equipment was properly grounded and that there were no problems. Mr. Copeland also explained that the power supply to the printer was fed from an isolated source and that this is important because power from an isolated source assures that voltage is staying the same and that transients are not being introduced into the printer.
54. During his inspections, Mr. Copeland used two different instruments to test the printer. He used an oscilloscope, which is a real-time reading device that allows you to look at the condition of the power coming into the device. Mr. Copeland also used an industrial grade fluke meter volt made by the Fluke Corporation. Both of these instruments are known as impetus devices and both of them actually read a very low amount of voltage on the printhead, in the amount of .27 volts.
55. Mr. Copeland indicated that when the cover to the printhead is removed from the printhead, the voltage at the charge electrode is essentially zero at what is called "noise level," or 0.27 volts. This is less voltage than one would be exposed to while holding an AA battery in the hand. He attached the oscilloscope and the fluke meter to an AA battery and it read 1.5 volts. Thus, when an AA battery is held in the hands, an individual is exposed to 1.5 volts, but there is no perception of voltage because it is so low. Yet, this is more voltage than is present on the uncovered printhead. Mr. Copeland also confirmed that he touched the printhead with his bare hands during testing. *Page 19 
56. In Mr. Copeland's opinion, an electrical engineer is qualified to render opinions regarding the hazards of a solvent such as MEK. He indicated that he noticed a perceptible smell of solvent during his visits to Tyson, but the odor was not significant in comparison with strong odors that he had been exposed to during his thirty-five year career with the Eastman Chemical Company.
57. Based on his calculations, investigation on July 14, 2004, investigation on July 26, 2004, and as an expert in the field of electrical engineering, to a reasonable degree of certainty in the field of electrical engineering, Mr. Copeland opined, and the Full Commission finds as fact, that there was no basis to show that the plaintiff received an electrical shock based on what he was doing on September 16, 2002. He also testified that based on his testing, he concluded that with the printhead cover removed, the printhead is safe to handle and touch during cleaning. Mr. Copeland also testified that in his opinion to a reasonable degree of certainty as an expert in the field of electrical engineering, the plaintiff did not receive an electrical shock from the Linx inkjet printer with serial number MD0125008 on September 16, 2002. Mr. Copeland found no evidence of failure of the safety interlock system of the printer that the plaintiff was using on September 16, 2002. He testified that he could say with a very high degree of engineering certainty that the plaintiff was not shocked from performing maintenance on the printhead.
58. Plaintiff retained John Bass, a registered mechanical and electrical engineer, to conduct testing on the plaintiff's printer at the Tyson facility on August 21, 2004. Mr. Bass is not a certified industrial hygienist, he does not have a medical degree or a license to practice medicine and he is not a certified chemical engineer, toxicologist, and is not employed by OSHA. *Page 20 
59. Although he did not perform any air sampling during his visit on August 21, 2004, Mr. Bass testified that the masks worn during the visit were not sufficient to provide effective respiratory protection from the vapors from MEK. With regard to the cause of the plaintiff's injuries, Mr. Bass testified that in his engineering opinion, the plaintiff's collapse and convulsions were consistent with both electrocution and inhalation of MEK. However, he confirmed that he does not know whether the plaintiff was actually electrocuted.
60. Mr. Bass was unable to find anything wrong with the plaintiff's printer with serial number MD0125008 and admitted that this printer was in very good condition. Nowhere in his report or during his testimony did he indicate that he identified any voltage present on the printhead of printer MD0125008 with the cover removed, or any problems with voltage with this printer. Mr. Bass implied that Tyson refurbished the plaintiff's printer in anticipation of his inspection, although he put forth no evidence to substantiate this allegation. The Full Commission gives little weight to the opinion of Mr. Bass because there is insufficient evidence of record to substantiate the same.
61. The record shows that prior to September 16, 2002, there had never been any kind of electrical shock issues with any of the Linx 6200 inkjet printers at Tyson Foods. Tyson Foods continued to use the plaintiff's printer through July/August 2004 without incident.
62. There is no evidence of record that Tyson was cited for any OSHA violations with regard to the Linx printers or any of the events that occurred on September 16, 2002.
63. The Full Commission finds that cleaning the printhead is a basic maintenance procedure that was part of plaintiff's regular job duties on September 16, 2002. The evidence of record establishes that at the time of the plaintiff's collapse on September 16, 2002, the cover of *Page 21 
the printhead of his printer was removed and the plaintiff was not exposed to any dangerous voltage.
64. Based upon the totality of the evidence of record, the Full Commission finds that performing the normal duties of cleaning a printhead on a Linx 6200 Inkjet printer did not pose any electrical hazard to the plaintiff on September 16, 2002. The record shows that the only way to receive any type of electrical shock from the printhead of the Linx 6200 Inkjet printer is for there to be a total failure of the built-in inter-lock safety system. There is no evidence of record to establish that the built-in safety interlock system of the plaintiff's printer failed on September 16, 2002.
 * * * * * * * * * * *
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. An individual claiming the benefits of compensation has the absolute burden of showing that the injury complained of resulted from a condition envisioned by the Workers' Compensation Act, in that he had either an injury by accident or an occupational disease. Hendrix v.Linn-Corriher Corp., 317 N.C. 179, 345 S.E.2d 374 (1986).
2. The plaintiff did not suffer an "accident" within the meaning of the North Carolina Workers' Compensation Act. N.C. Gen. Stat. § 97-2(6). No injury, regardless of the severity, is compensable unless it is preceded by and due to an accident. Davis v. Raleigh Rental Center,58 N.C. App. 113, 292 S.E.2d 763 (1982); Bowles v. CTS of Asheville,Inc., 77 N.C. App. 547, 335 S.E.2d 502 (1985); Pitillo v. NC Departmentof Environmental Health and Natural Resources, 151 N.C. App. 641,566 S.E.2d 807 (2002). *Page 22 
3. The plaintiff's injury did not "arise out of" his employment as contemplated by the North Carolina Workers' Compensation Act. N.C. Gen. Stat. § 97-2(6) "An injury arises out of the employment `when it occurs in the course of the employment and is a natural and probable consequence or incident of it, so that there is some causal relation between the accident and the performance of some service of the employment.' " Mills v. City of New Bern, 122 N.C. App. 283,468 S.E.2d 587 (1996); Plemmons v. White's Service, 213 N.C. 148,195 S.E. 370 (1938); Lewter v. Enterprises, Inc., 240 N.C. 399,82 S.E.2d 410 (1954); Taylor v. Wake Forest, 228 N.C. 346,45 S.E.2d 387 (1947).
4. When, however, the employee's idiopathic condition is the sole cause of the injury, the injury does not arise out of the employment.Mills v. City of New Bern, 122 N.C. App. 283, 468 S.E.2d 587 (1996);Vause v. Equipment Co., 233 N.C. 88, 63 S.E.2d 173 (1951).
5. Plaintiff's heart condition and brain damage was caused solely by idiopathic ventricular fibrillation or some other condition that was idiopathic in nature. Thus, plaintiff's heart condition and brain damage are not compensable. Janney v. J.W. Jones Lumber Co., Inc.,145 N.C. App. 402, 550 S.E.2d 543, appeal withdrawn, 354 N.C. 573,558 S.E.2d 870 (2001); Hodges v. Equity Group, 164 N.C. App. 339,596 S.E.2d 31 (2004).
6. Plaintiff is not entitled to any presumption that this claim is compensable. The Pickrell presumption does not extend to a plaintiff who survives his injury. Janney v. J. W. Jones Lumber Co., Inc.,145 N.C. App. 402, 550 S.E.2d 543 (2001).
7. No attribute of plaintiff's employment increased the dangerous effect of plaintiff's idiopathic condition. Thus, his condition is not compensable. Allred v. Allred-Gardner, Inc., 253 N.C. 554, 557,117 S.E.2d 476, 479 (1960). *Page 23 
8. Plaintiff has submitted insufficient expert medical testimony in which to support his claim. Click v. Pilot Freight Carriers, Inc.,300 N.C. 164, 265 S.E.2d 389 (1980); Young v. Hickory Bus. Furniture,353 N.C. 227, 538 S.E.2d 912 (2000); Holley v. Acts, Inc., 357 N.C. 228,581 S.E.2d 750 (2003).
9. The plaintiff's claim for a 10% penalty under N.C. Gen. Stat. § 97-12 is unsupported by the evidence of record. Beck v. Carolina Power Light Co., 57 N.C. App. 373, 383-84, 291 S.E.2d 897, 903; affirmedby 307 N.C. 267, 297 S.E.2d 397 (1982); Brewer v. Harris, 279 N.C. 288,297, 182 S.E.2d 345, 350 (1971).
10. The plaintiff's assertion that the defendant is subject to sanctions for spoliation of evidence is misplaced and without merit.Red Hill Hosiery Mill, Inc. v. Magnetek, Inc., 138 N.C. App. 70, 78,530 S.E.2d 321, 328, review denied 353 N.C. 268, 546 S.E.2d (2000);Yarborough v. Hughes, 139 N.C. 199, 209, 51 S.E. 904, 907-08 (1905);McClain v. Taco Bell Corp., 137 N.C. App. 179, 527 S.E.2d 712, reviewdenied 352 N.C. 357, 544 S.E.2d 563; review dismissed by 352 N.C. 357,544 S.E.2d 564 (2000); Kronisch v. United States, 150 F.3d 112, 126 (2d Cir. 1998).
11. Neither party brought nor defended this claim without reasonable ground. See N.C. Gen. Stat. § 97-88.1.
 * * * * * * * * * * *
Based on the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 ORDER
1. Under the North Carolina Workers' Compensation Act, the plaintiff's claim for workers' compensation benefits must be and is hereby denied. *Page 24 
2. Each side shall pay its own costs.
 S/___________________ CHRISTOPHER SCOTT COMMISSIONER
CONCURRING:
S/___________________ BERNADINE S. BALLANCE COMMISSIONER
S/___________________ DIANNE C. SELLERS COMMISSIONER *Page 1