RED HILL HOSIERY MILL, INC., PLAINTIFF v. MAGNETEK, INC., AND LITHONIA LIGHTING, INC., A DIVISION OF NATIONAL SERVICES INDUSTRIES, INC., DEFENDANTS

No. COA99-597

(Filed 16 May 2000)

### Products Liability— contract and negligence basis—summary judgment

Summary judgment for defendants in a products liability action arising from a fire that damaged a hosiery mill was affirmed in part and reversed in part where there was conflicting evidence as to whether the fire began in the ballast within a flourescent light fixture manufactured by defendants. A products liability recovery is premised on either negligence or contract principles of warranty and, on either theory, a product defect may be inferred from evidence of the product's malfunction if there is evidence that the product had been put to its ordinary use (but it is not permissible to infer manufacturer negligence from a product defect inferred from a product malfunction). There is a genuine issue of material fact in this case of whether the ballast was defective at the time it left the manufacturers' control and summary judgment on implied warranty of merchantibility was improper, but summary judgment on negligence was proper because there was no evidence of negligent manufacture, design, assembly, or inspection by either defendant.

Appeal by plaintiff from order for summary judgment filed 12 January 1999 and from order filed 29 January 1999 by Judge Loto Greenlee Caviness in Catawba County Superior Court. Heard in the Court of Appeals 22 February 2000.

*Pinto Coates Kyre & Brown, PLLC, by Richard L. Pinto and David L. Brown, for plaintiff-appellant.*

*Tuggle Duggins & Meschan, P.A., by J. Reed Johnston, Jr.; and Yopp & Sweeney, PLC, by Kathryn A. Stephenson, for defendant-appellee MagneTek, Inc.*

*Sigmon, Clark, Mackie, Hutton & Hanvey, PA, by J. Scott Hanvey; and Bovis, Kyle & Burch, LLC, by John H. Peavy, Jr., for defendant-appellee Lithonia Lighting, Inc.*

**RED HILL HOSIERY MILL, INC. v. MAGNETEK, INC.**

[138 N.C. App. 70 (2000)]

GREENE, Judge.

Red Hill Hosiery Mill, Inc. (Plaintiff) appeals from an order granting summary judgment for MagneTek, Inc. (MagneTek) and Lithonia Lighting, Inc., a division of National Services Industries, Inc. (Lithonia) (collectively, Defendants) entered 12 January 1999, and an order denying Plaintiff's motions for reconsideration, to amend the judgment, and for relief from the judgment entered 29 January 1999.

Plaintiff is the owner of a building located in Hickory, North Carolina, which was damaged by fire in March of 1996. Plaintiff alleges in its complaint the fire "began as a result of the malfunctioning of the ballast within a fluorescent lighting fixture" located in the building. It is further alleged the ballast and fluorescent light fixture, purchased in 1991, were "designed, manufactured and/or distributed by [D]efendants" who are, pursuant to "N.C.G.S. § 99B-1," responsible for the damage. Plaintiff asserts claims of negligence and breach of implied warranty of merchantability against both Defendants.[1] As for the negligence claims, it is alleged Defendants negligently produced, designed, manufactured, assembled, and inspected the ballast and fluorescent lighting fixture. As for the breach of implied warranty claim, it is alleged Defendants warranted the ballast and fluorescent lighting fixture to be of "merchantable quality," "reasonably fit for the purposes for which [they were] intended," and that they were "not reasonably fit for the purposes for which [they were] intended, but [were] instead defective."

The record reveals that during the early morning hours of 13 March 1996, a fire destroyed Plaintiff's greige manufacturing mill (the mill) located in Hickory, North Carolina. Hickory Fire Marshall Tommy Richard Bradshaw (Bradshaw), two agents of the North Carolina State Bureau of Investigation, and the Fire Inspector of the City of Hickory (collectively, the investigators) investigated the fire to determine its cause and origin. By interpreting the fire patterns, the investigators determined the area of origin of the fire was one of the flourescent light fixtures in the mill. This particular fluorescent light fixture sustained more damage than the adjacent fluorescent light fixtures in the mill.

---

1. Originally Plaintiff also asserted claims against other defendants; Bryant Electric Supply, Inc., NSI Enterprises, Inc., General Electric Capital Corporation, and Philips Electronics North America Corporation. Plaintiff filed voluntary dismissals of the claims against these other defendants.

RED HILL HOSIERY MILL, INC. v. MAGNETEK, INC.

[138 N.C. App. 70 (2000)]

The cover of the fluorescent light fixture was off,[2] there was oxidation on the fixture, indicative of exposure to high temperatures, and it displayed a discoloration on top of the fixture that indicated a specific area of heating, which was consistent with the location of the ballast installed on the underside of the fixture. Bradshaw testified if these heat patterns were caused by an external heat source as opposed to an internal heat source within the fixture, he would expect to see similar discoloration patterns on the adjacent fluorescent light fixtures. The investigators examined the adjacent fluorescent light fixtures and did not observe any similar discoloration patterns. The investigators were unable to find any faults within the fixture or its power cord, excluding the ballast.

The investigators concluded the fire was caused by the ignition of lint following the overheating of the ballast[3] within the flourescent light fixture. The investigators excluded all other possible sources of the fire, including the mill's electrical and mechanical systems.

After the investigators made their determination, Bradshaw released the fire scene to Plaintiff in order to begin its clean-up efforts. Bradshaw was satisfied he had established a cause and origin of the fire and the relevant evidence to that effect had been preserved.

Plaintiff's expert in electrical engineering, physics, and fire investigation, James Samuel McKnight, Ph.D. (McKnight), reviewed the fire scene approximately one week after the fire. By that time, extensive clean-up efforts were underway, and McKnight was able to view only the physical layout of the mill and some fire damage.

Bradshaw had removed the suspect fluorescent light fixture from the mill and later provided it to McKnight. Bradshaw did not, however, preserve the adjacent fluorescent light fixtures he had used to compare to the suspect light fixture, as they were discarded after their removal from the mill. McKnight's review and conclusion as to the cause of the fire was that the ballast malfunctioned and overheated. McKnight based his conclusions on the facts that the suspect fluorescent light fixture displayed a specific area of heat intensity and over one-half of the potting compound within the ballast had

---

2. The investigators agreed the cover of the fluorescent light fixture was probably knocked off during the fire fighting efforts.

3. A ballast is a black metal box containing electrical components, a thermal protector, and potting compound that is an asphalt-like substance that holds the components in place and dissipates heat generated by normal operation of a light fixture.

seeped out. McKnight believes the ballast had improperly overheated to such an extent that the potting compound located within the ballast liquified and leaked out of the ballast. McKnight considered other possible sources for the fire but concluded no other cause was reasonable. Although McKnight opined the ballast overheated, he could not identify any specific defect within the ballast.

MagneTek's expert witness David Walter Powell (Powell) performed a disassembly of the suspect ballast to determine if any failures occurred to the ballast prior to the fire. According to Powell, the tear-down demonstrated there was no damage to any interior electrical components of the ballast. Further, the potting compound showed no extensive heat damage. The thermal protector inside the suspect ballast was tested and found to function at a temperature that was not a hazardous temperature for the combustion of lint. Powell testified "[t]he purpose of the thermal protector is for any reason the ballast should reach a preset temperature, it is to disconnect power to the ballast until it cools down."

McKnight observed the tear-down and testified he did not find any evidence of arcing on the exterior or interior of the suspect ballast, and he had no opinion as to whether the thermal protector was operational at the time of the fire. McKnight, however, did opine "[t]he failure may have happened in such a way that the temperature increased in part of the ballast rapidly enough that it ignited the lint on top of the fixture before the thermal protector operated."

Powell and the fire investigator for MagneTek, Donald Robert Dowling, opined the pattern on top of the suspect fluorescent light fixture's housing was not indicative of internal overheating, rather it was a "fire-pattern" coming from external heat. Powell did not know what caused the fire at the mill, but he stated the suspect ballast was not the culprit.

The suspect ballast was independently manufactured by MagneTek and purchased by Lithonia for incorporation into flourescent light fixtures Lithonia assembled. The suspect ballast was tested by MagneTek and represented to Lithonia as meeting the Underwriters Laboratories' standards.

Powell testified the suspect ballast "is . . . designed to operate . . . in just about any conventional [flourescent light] fixture." Powell also testified the suspect flourescent light fixture "is a straight commercial strip" and the ballast was appropriate for incorporation into the fluorescent light fixture.

Russell Vern Rouse (Rouse), a representative for Lithonia, testified the suspect fluorescent light fixture was appropriate for operation in a facility such as the mill, and it was a reasonable and expected use of both the ballast and the fluorescent light fixture to operate in a hosiery mill. Rouse also testified the suspect fluorescent light fixture can be suspended from above by chains or directly mounted to a surface.

Tony Moretz Whitener (Whitener), a representative for Plaintiff, testified the mill's fluorescent light fixtures were installed by an electrical contractor, were suspended from the ceiling by chains approximately eight feet off of the floor, and were powered by a ground power cord plug, so that the fixtures could be easily replaced. Whitener testified if a fluorescent light fixture stopped working they would replace the flourescent light bulbs, and if the fixture was still inoperable, Plaintiff would not attempt to replace the ballast but instead would replace the entire fluorescent light fixture. Whitener testified that to his knowledge none of the fluorescent light fixtures in the area of the mill where the fire started had been replaced, because they were still relatively new. Whitener also stated Plaintiff's employees cleaned lint and dust off of the top of the mill's fluorescent light fixtures every third day, and all of the fluorescent light fixtures in the mill were operational at the time of the fire.

---

The issues are whether there is: (I) a genuine issue of material fact that the fluorescent light fixture (ballast) was defective; and (II) a genuine issue of material fact that Defendants were negligent in the manufacture, design, assembly, and/or inspection of the fluorescent light fixture (ballast).

## Products Liability

Plaintiff's claims against Defendants are within the scope of Chapter 99B of our General Statutes and thus constitute a products liability action. N.C.G.S. § 99B-1(3) (1999) (action for property damage caused by manufacturing or assembling of a product); *see Crews v. W.A. Brown & Son*, 106 N.C. App. 324, 328, 416 S.E.2d 924, 928 (1992). A products liability claim "normally contemplates injury or damage caused by a defective product,"[4] 1 M. Stuart Madden,

---

4. For example, "if the damage is exclusively to the product itself, or if it does not perform in the manner represented or reasonably expected, or if it is of inferior quality, the claim for the resulting loss does not fall within the usual meaning of 'products liability.'" 1 M. Stuart Madden, *Products Liability* § 1.1, at 5 (2d ed. 1988) [hereinafter 1 *Products Liability*]; *see* 3 Ronald A. Anderson, *Anderson on The Uniform*

**RED HILL HOSIERY MILL, INC. v. MAGNETEK, INC.**

[138 N.C. App. 70 (2000)]

*Products Liability* § 1.1, at 5 (2d ed. 1988) [hereinafter 1 *Products Liability*], and recovery is premised on either negligence or on the contract principles of warranty, *id.* at 6; *Crews*, 106 N.C. App. at 329, 416 S.E.2d at 928.

A products liability claim grounded in *negligence* requires the plaintiff prove (1) the product was defective at the time it left the control of the defendant, (2) the defect was the result of defendant's negligence, and (3) the defect proximately caused plaintiff damage.[5] 1 *Products Liability* § 2.3, at 26; *Jolley v. General Motors Corp.*, 55 N.C. App. 383, 385-86, 285 S.E.2d 301, 303 (1982). Under a claim based on negligence, a manufacturer has the duty to use reasonable care throughout the manufacturing process, including making sure the product is free of any potentially dangerous defect in manufacturing or design. This "duty of care . . . may involve inspection or testing of [the] product, which includes [the] duty to inspect products manufactured by another which are component parts of the product produced by the manufacturer." 1 *Products Liability* § 3.11, at 69; *see* N.C.G.S. § 99B-1(2) (manufacturer includes persons who assemble component parts of product). An inference of a manufacturer's negligence arises upon proof of an actual defect in the product. *Pouncey v. Ford Motor Company*, 464 F.2d 957, 961 (5th Cir. 1972) (jury permitted to infer negligence from expert's testimony of product defect); 1 *Products Liability* § 2.3, at 27 (inference of negligence permitted upon "direct evidence of an actual defect in the product").

A products liability claim grounded in *warranty* requires the plaintiff prove (1) the defendant warranted the product (express or implied) to plaintiff, (2) there was a breach of that warranty in that the product was defective at the time it left the control of the defendant, and (3) the defect proximately caused plaintiff damage. 1 *Products Liability* § 2.7, at 32-33; *Morrison v. Sears, Roebuck & Co.*, 319 N.C. 298, 301, 354 S.E.2d 495, 497 (1987). Thus, a products liability claim based on breach of warranty is not dependent upon a showing of negligence.

---

*Commercial Code* § 2-314:167, at 363-65 (3d ed. 1995) (breach of warranty does not always require showing of a defect, as products failure to conform to contract standard is sufficient).

5. "To prove a product defective is one thing; to prove that the defect flowed from a failure to exercise reasonable care is quite another. Proof of defect does not, without more, prove negligence, as even the most careful manufacturer may produce a defective product." 1 *Products Liability* § 4.7, at 127.

RED HILL HOSIERY MILL, INC. v. MAGNETEK, INC.

[138 N.C. App. 70 (2000)]

### Product Defect

There is some dispute among the courts as to whether the plaintiff has the burden of showing the specific nature of the product defect in a products liability action. *See* 1 *Products Liability* § 2.3, at 26. Some courts require plaintiff to prove the product defect with particularity. *E.g., MacDougall v. Ford Motor Co.*, 257 A.2d 676, 678 (Pa. Super. 1969), *overruled on other grounds, REM Coal Co., Inc. v. Clark Equipment Co.*, 563 A.2d 128 (Pa. Super. 1989). Other courts, and apparently the majority view, hold a product defect is properly inferred from evidence of the product's malfunction in ordinary use, whether the products liability claim is grounded in tort or warranty. *E.g., Mitchell v. Maguire Co., Inc.*, 542 N.Y.S.2d 603, 604 (A.D. 1 Dept. 1989); *see* 1 *Products Liability* § 5.10, at 156-57; 1 *Products Liability* § 2.3, at 38 (Supp. 1999). Although our North Carolina courts have not specifically addressed this issue, our courts have permitted an inference of a product defect upon a showing the product malfunctioned after the product had been put to ordinary use.[6] *See Bernick v. Jurden*, 306 N.C. 435, 450, 293 S.E.2d 405, 415 (1982) (claim of injuries caused by broken mouth guard survives summary judgment of breach of implied warranty claim, even though no evidence of specific defect of mouth guard); *City of Thomasville v. Lease-Afex, Inc.*, 300 N.C. 651, 656, 268 S.E.2d 190, 194 (1980) (evidence fire suppression system malfunctioned supports "fair inference" of product defect); *Rose v. Motor Sales*, 288 N.C. 53, 59, 215 S.E.2d 573, 577 (1975) (fire originating in motor compartment of vehicle gives rise to inference of product defect); *Maybank v. Kresge Co.*, 46 N.C. App. 687, 692, 266 S.E.2d 409, 412 (1980) (flashcube "which does not work properly" is not merchantable and supports claim for breach of implied warranty of merchantability), *aff'd on warranty issue and modified on notice requirement*, 302 N.C. 129, 273 S.E.2d 681 (1981). We hold in a products liability action, based on tort or warranty, a product defect may be inferred from evidence of the prod-

_____

6. Defendants point to two Court of Appeals cases and argue they require evidence of the specific nature of the product defect. We disagree. In *Jolley v. General Motors Corp.*, 55 N.C. App. 383, 285 S.E.2d 301 (1982), plaintiff sought damages for injuries sustained in a vehicle accident he claims was caused by a blown tire purchased from defendant. *Id.* at 384, 285 S.E.2d at 302-03. This Court held there was no showing the tire was defective and affirmed a directed verdict for defendant. *Id.* at 386, 285 S.E.2d at 304. In *Cockerham v. Ward and Astrup Co. v. West Co.*, 44 N.C. App. 615, 262 S.E.2d 651, *disc. review denied*, 300 N.C. 195, 269 S.E.2d 622 (1980), plaintiff claimed damages for injuries sustained when a rubber strap broke and struck him in the eye as he was attempting to use it to secure a tarpaulin over a load of oats in a truck. *Id.* at 619-20, 262 S.E.2d at 655. This Court affirmed summary judgment for defendants on the ground there was "no evidence to show that a defect existed." *Id.* at 619, 262 S.E.2d at

uct's malfunction if there is evidence the product had been put to its ordinary use.[7]

## I

## Implied Warranty of Merchantability

Plaintiff argues there exists genuine issues of material fact regarding whether the flourescent light fixture and ballast at issue were fit for the ordinary purpose for which such goods are used, thus, supporting its claim of products liability based on breach of implied warranty of merchantability. N.C.G.S. § 25-2-314(1), (2)(c) (1999) (warranty that goods are merchantable is implied if "seller is a merchant" and goods are merchantable if they are "fit for the ordinary purposes for which such goods are used"); *Gillispie v. Bottling Co.*, 17 N.C. App. 545, 549, 195 S.E.2d 45, 48 (implied warranty of merchantability applies to manufacturer of goods), *cert. denied*, 283 N.C. 393, 196 S.E.2d 275 (1973). We agree.

In this appeal, neither MagneTek nor Lithonia dispute that the fluorescent light fixture, of which the ballast was a component part, is subject to an implied warranty of merchantability. Defendants do argue, however, there was no breach of this warranty because there is no evidence the fluorescent light fixture or the ballast were defective at the time they left their respective control. We disagree.

There is evidence from McKnight and the investigators that the fire that destroyed the mill originated at the suspect fluorescent light fixture and was caused by the ballast, even though they could not point to a specific defect within the ballast. Although there was also evidence the ballast was not defective and did not cause the fire, the evidence from Powell, Rouse, Whitener, McKnight, and the investigators, considered in the light most favorable to Plaintiff, is such that reasonable minds might accept it as adequate to support the conclu-

---

655. We do not read *Jolley* and *Cockerham* as holding that proof of a malfunctioning product cannot support an inference of a defect in that product. In *Jolley*, there was no evidence the tire malfunctioned, as its explosion could have been caused by something other than the tire. Likewise, in *Cockerham*, there was no evidence the rubber strap malfunctioned, as it could have been weakened by a cut. In any event, to the extent these cases can be read as holding otherwise, they are inconsistent with the opinions of our Supreme Court and must be rejected. *See Bernick v. Jurden*, 306 N.C. 435, 450, 293 S.E.2d 405, 415 (1982); *City of Thomasville v. Lease-Afex, Inc.*, 300 N.C. 651, 656, 268 S.E.2d 190, 194 (1980); *Rose v. Motor Sales*, 288 N.C. 53, 59, 215 S.E.2d 573, 577 (1975).

7. It is not, however, permissible to infer manufacturer negligence from a product defect which has been inferred from a product malfunction.

sion the ballast malfunctioned in its ordinary use, thus, giving rise to an inference that the ballast was defective. Consequently, there is a genuine issue of material fact of whether the ballast was defective at the time it left MagneTek's and Lithonia's control, and summary judgment on this basis was, therefore, improper. *Kessing v. Mortgage Corp.*, 278 N.C. 523, 534, 180 S.E.2d 823, 830 (1971) (summary judgment inappropriate if evidence raises genuine issue(s) of material fact and a "genuine issue is one which can be maintained by substantial evidence"); *Brice v. Moore*, 30 N.C. App. 365, 367, 226 S.E.2d 882, 883 (1976) (evidence presented at summary judgment hearing must be viewed in the light most favorable to nonmovant); *Comr. of Insurance v. Rating Bureau*, 292 N.C. 70, 80, 231 S.E.2d 882, 888 (1977) (substantial evidence is that evidence which would support a conclusion, among reasonable minds, that a certain fact has been proven); *Roumillat v. Simplistic Enterprises, Inc.*, 331 N.C. 57, 63, 414 S.E.2d 339, 342 (1992) ("[a]ll inferences of fact must be drawn . . . in favor of nonmovant").

Defendants argue the evidence from McKnight and the investigators, based in large part on a comparison of the suspected fluorescent light fixture with the "other flourescent light fixtures" in the mill, cannot be relied upon to establish a genuine issue of fact. This is so, Defendants contend, because they were allowed access to the suspected fluorescent light fixture only and denied access to the mill's "other flourescent light fixtures" used in the comparison. Our courts have held a party's intentional destruction of evidence in its control before it is made available to the adverse party can give rise to an inference that the evidence destroyed would injure its (the party who destroyed the evidence) case. *See McLain v. Taco Bell Corp.*, 137 N.C. App. 179, 183-84, 527 S.E.2d 712, 715-16 (2000). This principle is known as "spoliation of evidence."

In this case, the evidence shows the "other flourescent light fixtures" were destroyed by Plaintiff in its effort to repair the mill, and they were not made available to Defendants. At the summary judgment stage of these proceedings and based on the evidence in this record, the evidence does not give rise to an inference the "other flourescent light fixtures," if available for inspection by Defendants, would harm Plaintiff's case. The issue of Plaintiff's spoliation of the evidence is, nonetheless, proper for development at trial after remand of this case.

**KIRKPATRICK v. VILLAGE COUNCIL**

[138 N.C. App. 79 (2000)]

## II

### Negligence

Defendants again argue there is no evidence to show a defect existed in the fluorescent light fixture or ballast at the time of their manufacture. We disagree for the reasons given in section I of this opinion. In the alternative, they argue there is no evidence the items were negligently manufactured, designed, assembled, or inspected. We agree with the alternative argument.

Although there is a genuine issue of fact with respect to the malfunction of the suspect fluorescent light fixture (ballast), which malfunction can support an inference the fluorescent light fixture (ballast) was defective, there is no evidence of negligent manufacture, design, assembly, or inspection by either of the Defendants. Because there was no specific evidence of a defect in the suspect fluorescent light fixture (ballast), an inference of negligence does not arise, and summary judgment for both Defendants on this issue was, therefore, proper.

Affirmed in part, reversed in part, and remanded.

Judges WALKER and TIMMONS-GOODSON concur.