**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 11-1427**

———————

FARRAR & FARRAR FARMS,

       Appellant,

FARRAR & FARRAR DAIRY, INCORPORATED, on behalf of itself and
all others similarly situated,

       Plaintiff – Appellant,

    v.

MILLER—ST.NAZIANZ, INCORPORATED,

       Defendant – Appellee

    and

HYPLAST NV; KLERK'S PLASTIC PRODUCTS MANUFACTURING,
INCORPORATED,

       Defendants.

———————

Appeal from the United States District Court for the Eastern
District of North Carolina, at Raleigh.  James C. Dever, III,
Chief District Judge.  (5:06-cv-00160-D)

———————

Argued:  March 22, 2012        Decided:  April 27, 2012

———————

Before Sandra Day O'CONNOR, Associate Justice (Retired), Supreme
Court of the United States, sitting by designation, TRAXLER,
Chief Judge, and HAMILTON, Senior Circuit Judge.

———————

Affirmed by unpublished per curiam opinion.

———————

**ARGUED:** Scott Crissman Harris, WHITFIELD, BRYSON & MASON, LLP, Raleigh, North Carolina, for Appellants. Ross Alan Anderson, WHYTE HIRSCHBOECK DUDEK S.C., Milwaukee, Wisconsin, for Appellee. **ON BRIEF:** Daniel K. Bryson, LEWIS & ROBERTS, PLLC, Raleigh, North Carolina, for Appellants. R. Thompson Wright, HILL, EVANS, DUNCAN, JORDAN & BEATTY, Greensboro, North Carolina; Karen L. Tidwall, WHYTE HIRSCHBOECK DUDEK S.C., Milwaukee, Wisconsin, for Appellee.

---

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Farrar & Farrar Dairy, Inc., and Farrar & Farrar Farms (collectively "Farrar") appeal a district court order granting summary judgment against them in their products liability action against Miller-St. Nazianz, Incorporated ("Miller"). Finding no reversible error, we affirm.

## I.

Farrar & Farrar Dairy, Inc., is a North Carolina corporation that owns and operates a small dairy farm. Farrar & Farrar Farms is a North Carolina partnership that owns the farm's land and livestock. Miller is a Wisconsin corporation that sells farm equipment and products.

In late 2004, Miller purchased the operating assets and inventory of Ag-Bag International, Inc. ("Ag-Bag"), a company that sold agricultural silage bags under the name "Ag-Bag."[1] After purchasing the assets, Miller decided to continue distributing silage bags under the "Ag-Bag" brand name. At the

---

[1] Silage is green forage or fodder that has been chopped and compacted into an anaerobic container such as a bunker or fixed silo. Silage storage bags are designed to provide an alternative method of protecting such farm feed from spoilage. While inside the bag, silage undergoes an acid fermentation process that prevents it from spoiling. A bagging machine mechanically inserts the silage into the silage bag. The bags can be as long as 300 feet and up to 14 feet wide.

time of the asset purchase, Ag-Bag had a contractual relationship with Up North Plastics, Inc. ("Up North"), which manufactured the Ag-Bag bags. Miller terminated that relationship, however, and found another manufacturer, Hyplast NV ("Hyplast"). Because Miller did not receive Ag-Bag's plastic formula when it purchased Ag-Bag's assets, Miller provided Hyplast with a bag that Up North had manufactured, and Hyplast reverse-engineered a new formula.

Farrar purchased twelve 10-foot X 250-foot Ag-Bag silage bags from an authorized dealer on April 18, 2005, and fourteen more bags of varying size on August 15 of the same year. Some of these 26 bags had been manufactured by Up North, and others by Hyplast.

The warranty accompanying Farrar's Ag-Bags stated in part:

> Ag-Bag® . . . guarantees our "Bonded"[] silage bags to be free of defects in workmanship and materials. If a properly packed bag should fail from a defect during normal useful life, Ag-Bag® will replace the bag without charge. If the feed in the damaged bag requires rebagging[,] Ag-Bag® will replace the bag with two bags.

J.A. 1304. Additionally, each Ag-Bag box contained a document titled "Flat-Folded Bag Installation Instructions," which included the following language:

> All recommendations or suggestions of use are made without guarantee, since conditions of use are beyond our control[.] Ag-Bag . . . maintains no obligations or liabilities for consequential damages arising out of, or in connection with[,] use of this product,

4

> including but not limited to inconvenience, loss of profit, commercial use, food loss of any type, or costs o[f] removal, installation or reinstallation.

J.A. 239.

Shortly after purchasing the bags in April 2005, Farrar notified Miller that several of the bags had split. Accordingly, Miller contacted Arthur Schuette, a Miller representative who lived near Farrar, to investigate. Schuette visited the Farrar farm soon after and visually inspected the split bags. He noticed some stretching that he knew, more times than not, was the result of the bags being overpacked. However, he also learned that the type of crop that had been packed was rye silage, which, in his experience, tended to "cause more bag stretching than a lot of other crops." J.A. 1028. For that reason, Schuette "decided to give . . . Farrar the benefit of the doubt" and submit a warranty claim to Miller on his behalf with the recommendation that Farrar receive replacement bags. J.A. 1028. Miller then processed the warranty claims and provided Farrar with replacement bags. At least one of the replacement bags also split. The record does not reflect whether another replacement bag or bags were provided.

As a result of the bags' splitting, Farrar incurred costs associated with lost feed, re-bagging, disposal of spoiled silage, acquiring new bags and techniques and new silage, and a

5

decrease in farm profitability due to the resources that it was required to expend addressing the bag failures.

Farrar subsequently brought suit in federal district court against Miller, asserting claims of negligence, breach of express warranty, breach of implied warranty of merchantability, unfair trade practices, and unjust enrichment. In response to a motion for summary judgment filed by Miller, Farrar abandoned the latter two claims. The district court granted Miller's motion regarding the remaining three claims.

## II.

Farrar first argues that the district court erred in granting summary judgment on its negligence claim. We disagree.

We review the district court's grant of summary judgment de novo, viewing the facts and the reasonable inferences therefrom in the light most favorable to the nonmoving party. See EEOC v. Navy Fed. Credit Union, 424 F.3d 397, 405 (4th Cir. 2005). Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and [that] the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). "Because we are sitting in diversity, our role is to apply the governing state law, or, if necessary, predict how the state's highest court would rule on an unsettled

issue." <u>Horace Mann Ins. Co. v. General Star Nat'l Ins. Co.</u>, 514 F.3d 327, 329 (4th Cir. 2008).

Under North Carolina law, which the parties agree applies to the claims before us, a plaintiff bringing a products liability action based on negligence must "prove (1) the product was defective at the time it left the control of the defendant, (2) the defect was the result of defendant's negligence, and (3) the defect proximately caused plaintiff damage." <u>Red Hill Hosiery Mill, Inc. v. MagneTek, Inc.</u>, 530 S.E.2d 321, 326 (N.C. Ct. App. 2000).

Farrar sought to prove that had Miller exercised reasonable quality control practices with respect to the silage bags that it purchased from Hyplast to resell under the Ag-Bag brand, it would have discovered that they were defectively designed. In moving for summary judgment on the negligence claim, Miller maintained, as is relevant here, that Farrar failed to create a genuine dispute regarding whether the failed bags were defective or whether the defect was the result of Miller's negligence.

In response, Farrar pointed to evidence that Miller, aware that other companies had experienced problems with their silage bag manufacturers, had contemplated sending the Hyplast bags to an independent lab for analysis. Farrar also pointed to evidence that many other of Miller's customers experienced problems with their bags in the summer of 2005, and that several

7

Miller employees expressed concerns about the quality of the plastic Hyplast used to make the bags and theories regarding why some of the bags were failing. Farrar further offered evidence of a PowerPoint presentation, apparently given by Hyplast in late 2005, stating an "[i]ntermediate conclusion" that bags it examined split due to a combination of factors including that the three-ply bags had a transparent middle layer, J.A. 1301, in contrast to Up North's bags, which had utilized a white middle layer. The presentation suggested that a white middle layer better reflected the sun's rays and therefore better protected the bags from the effects of high temperatures. After this presentation, Hyplast informed Miller that "a certain 'batch'" of the bags Hyplast had shipped to Miller appeared to have "a possible higher than normal failure rate" and were "possibly defective." J.A. 1979, 1713. Miller, in turn, notified its territory managers and dealers of that information, and the territory managers notified their dealers that "if any of the specific lot of potentially problematic silage bags identified by Hyplast were in their possession, they should be returned to [Miller] and they would be exchanged for new silage bags." J.A. 1979.

Farrar maintained that by producing the above-mentioned evidence, it had proffered both direct evidence of the defectiveness of the bags in question and proven their

8

defectiveness by showing "(1) [that] the silage bags malfunctioned; (2) that the silage bags were put to ordinary use; (3) [the occurrence of] similar accidents involving the same product; and (4) [the] elimination of other possible causes of the accident." J.A. 966. Farrar contended that the direct evidence it had referenced gave rise to an inference of negligence on the part of the manufacturer.[2] It further maintained that Miller had been "on notice of potential problems with the silage bags, and that a reasonable man would have exercised greater care in inspecting and testing" them. J.A. 972.

On reply, as is relevant here, Miller argued that much of Farrar's evidence would not be admissible at trial and therefore could not be considered at the summary judgment stage. Miller further emphasized that Farrar had not produced any direct evidence of a product defect that would be admissible at trial and no direct evidence of Miller's negligence. Miller therefore asserted that Farrar had failed to create a genuine dispute regarding the negligence element of its negligence claim.

_____

[2] Farrar maintained that Miller, "as the apparent manufacturer of the silage bags, . . . had a duty to use reasonable care in the design and manufacture of its products." J.A. 969.

9

Farrar filed a sur-reply in which it defended the admissibility of its proffered evidence.

In granting summary judgment against Farrar on this claim, the district court agreed with Miller that Farrar had failed to create a genuine dispute regarding whether any defect in the bags sold to Farrar was the result of negligence on Miller's part. The court noted that, under North Carolina law, defectiveness of a product may be established by indirect evidence and negligence can sometimes be inferred from the existence of a product defect. However, the court ruled that negligence cannot be inferred from the existence of a defect if the defect has been established entirely by indirect evidence. Determining that Farrar had not offered direct evidence (such as expert testimony) that the bags were defective, the court ruled that, in order to prove Miller's negligence, Farrar would have to present "evidence that suggests what a reasonable person would do in similar circumstances." J.A. 2610-11 (internal quotation marks omitted). Concluding that "the record lacks any information as to quality control mechanisms that distributors generally employ for goods manufactured by an independent manufacturing company," J.A. 2612, the court granted summary judgment against Farrar on the negligence claim.

Farrar advances several challenges to the court's analysis, which we address seriatim.

10

Farrar first contends that the district court mischaracterized North Carolina law when it concluded that when a products liability plaintiff relies on indirect evidence to prove that the product was defective, it cannot rely solely on the same evidence to prove the defect was the result of the defendant's negligence. Farrar is incorrect, however, as that proposition is established both by Dewitt v. Eveready Battery Co., 550 S.E.2d 511, 520 (N.C. Ct. App. 2001), aff'd on other grounds, 565 S.E.2d 140 (N.C. 2002), and by Red Hill Hosiery Mill, Inc., 530 S.E.2d at 327 n.7. See also Carlton v. Goodyear Tire & Rubber Co., 413 F. Supp. 2d 583, 588 (M.D.N.C. 2005) (explaining that products-liability plaintiff "may not prove negligence by stacking inference upon inference"). Farrar insists that the principle that a products liability plaintiff cannot prove negligence simply by offering circumstantial evidence of a product defect is "inconsistent with the North Carolina Supreme Court's statement in DeWitt that a plaintiff need not satisfy each of the factors explicitly stated in DeWitt to prove a product defect through circumstantial evidence." Appellants' brief at 24. That is not the case, however. Rather, the principle simply reflects that "[t]o prove a product defective is one thing," but "to prove that the defect flowed from a failure to exercise reasonable care is quite

11

another." Red Hill Hosiery Mill, Inc., 530 S.E.2d at 326 n.5 (internal quotation marks omitted).

Farrar alternatively contends that it presented direct evidence of a design defect in Farrar's split bags, from which Miller's negligence could be reasonably inferred. Relying on the testimony of Miller's Rule 30(b)(6) witness, Steve Pesik, Farrar contends Miller tested plastic samples from each of the eight silage bags at issue, and determined, based on the testing, that each was defective. See Appellants' brief at 26 (citing J.A. 1869-70). Farrar's characterization misstates Pesik's testimony, however. Pesik testified that Miller treated Farrar's warranty claims as viable losses under the limited warranty that covered defects in material and workmanship. Pesik did not testify that Miller tested each bag, and he certainly did not testify there was any defect in the bags' design. In any event, because Farrar did not rely on the existence of this testimony in opposing Miller's summary judgment motion in the district court, the court was not required to consider it. See Fed. R. Civ. P. 56(c)(3).

Miller also argues that Hyplast's PowerPoint presentation constituted direct evidence of the defectiveness of the bags' design. However, evidence of this presentation was inadmissible hearsay. See Maryland Highway Contractors Ass'n v. State of Md., 933 F.2d 1246, 1251 (4th Cir. 1991) ("[H]earsay evidence,

12

which is inadmissible at trial, cannot be considered on a motion for summary judgment."). Farrar did not identify or depose the author of the presentation, and no one at Hyplast was questioned concerning its contents. Farrar argues conclusorily that evidence of the presentation would fall under the business records hearsay exception, see Fed. R. Evid. 803(6), but Farrar fails to explain how the elements of that exception could be established. In any event, while the presentation does suggest steps for Hyplast to take in an effort to improve the bags, it does not appear to conclude that any problem with the design of the bags rose to the level of a design defect.

In its reply brief, Farrar contends for the first time that Miller's negligence could be reasonably inferred not simply from evidence of the bags' defectiveness but from direct evidence that Miller failed to "perform an adequate investigation or inspection of the silage bags or issue a recall for approximately six months" and to warn its customers of the problems. Appellants' reply brief at 27. In this regard, Farrar asserts that Miller learned of a problem with its Hyplast-manufactured silage bags during the weeks of May 30 and June 6, 2005.

Because Farrar did not make this argument in its opening brief, it is waived. See Edwards v. City of Goldsboro, 178 F.3d 231, 241 n.6 (4th Cir. 1999) (claim not properly raised in

13

appellant's opening brief is deemed abandoned); Cavallo v. Star Enter., 100 F.3d 1150, 1152 n.2 (4th Cir. 1996) (argument not raised in opening brief, but raised for first time in reply brief, is waived). In any event, the district court rejected this same argument on the bases that (1) "the record lacks any information as to quality control mechanisms that distributors generally employ for goods manufactured by an independent manufacturing company" and (2) neither Miller's awareness of problems other companies had experienced with their silage bag manufacturers nor the fact that Miller contemplated sending Hyplast's bags to an independent lab for testing is sufficient "to show whether a reasonable person, in similar circumstances to Miller, would have conducted such an independent lab analysis or adopted some other quality control measure." J.A. 2612. In its reply brief, Farrar simply argues that the district court erred in concluding that Farrar failed to create a jury issue with this theory without addressing, or even acknowledging, the basis for the district court's ruling. See Appellants' reply brief at 25-29. Thus, Farrar's argument is waived for this reason as well. See Eriline Co. S.A. v. Johnson, 440 F.3d 648, 653 n.7 (4th Cir. 2006) (holding that conclusorily assigning error without providing supporting argument is insufficient to raise issue).

III.

Farrar next maintains that the district court erred in granting summary judgment against it on its claims for breach of Miller's express warranty and breach of an implied warranty of merchantability. We disagree.

The district court ruled that Miller owed Farrar a duty both under its express warranty and under an implied warranty of merchantability. Under North Carolina's implied warranty of merchantability, Farrar could recover "the difference . . . between the value of the goods accepted and the value they would have had if they had been as warranted." N.C. Gen. Stat. § 25-2-714(2). Additionally, "[i]n a proper case any incidental and consequential damages under . . . [§ 25-2-715] may also be recovered." N.C. Gen. Stat. § 25-2-714(3). North Carolina statutory law also permits written warranties to limit the remedy available in the event of a breach; however, when "circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided" in the absence of the warranty limitations. N.C. Gen. Stat. § 25-2-719(2). Finally, "[c]onsequential damages may be limited or excluded unless the limitation or exclusion is unconscionable." N.C. Gen. Stat. § 25-2-719(3).

Miller's express warranty provided that should an Ag-Bag fail from defect, it would be replaced without charge and that

15

should the damaged bag require the farmer to rebag the feed, Miller would provide two replacement bags. The district court treated this remedy and the remedies granted under North Carolina statutory law as consistent and therefore cumulative. The court concluded that since Farrar chose to remedy the breach by accepting replacement bags, it was not entitled to any additional remedy under N.C. Gen. Stat. § 25-2-714. As for Miller's exclusion of consequential damages, the district court noted it was valid unless it was unconscionable, which the court concluded it was not. Farrar offers several challenges to the district court's analysis, which we consider seriatim.

Farrar first maintains that the district court erred in not recognizing that Miller's warranty failed of its essential purpose, and therefore that Farrar was entitled to all of the remedies listed in § 25-2-714, including consequential damages.[3] A limited, exclusive remedy fails of its essential purpose when "unanticipated circumstances preclude the seller from providing the buyer with the remedy to which the parties agreed." Computer Network, Inc. v. AM Gen. Corp., 696 N.W.2d

---

[3] In this regard, Farrar claims that "Farrar never actually made the warranty claim under the express warranty." Appellants' brief at 33-34. However, Farrar, when asked at deposition whether he ever submitted a written warranty claim, responded that he dealt with Schuette and "[w]hatever he had me do is what[] I did." J.A. 2302.

49, 55 (Mich. Ct. App. 2005) (internal quotation marks omitted); see Stutts v. Green Ford, Inc., 267 S.E.2d 919, 926 (N.C. Ct. App. 1980) (holding that a warranty fails of its essential purpose when "there is a defect which is not or cannot be repaired within a reasonable period as required by the warranty"). We see no basis for concluding that Farrar showed that it did not receive the remedy that Miller had promised. Miller provided replacements for the defective bags within a reasonable period of time, just as its warranty contemplated. Although at least one of the replacement bags also ended up splitting, Farrar offers no evidence that the replacement bag was not also promptly replaced.

In the end, Farrar seems to suggest that the warranty failed of its essential purpose because Miller did not compensate Farrar for the substantial costs it incurred "with purchasing new feed, the labor costs of rebagging the feed, and the loss in milk production due to Farrar's inability to adequately feed his livestock." Appellants' brief at 36. Of course, though, the fact that Farrar was not compensated for those losses simply reflected Miller's disclaimer of consequential damages. It is to the effectiveness of that disclaimer that we now turn.

Farrar argues that the disclaimer of consequential damages was not effective because it was "not conspicuous as required by

17

[N.C. Gen. Stat. §] 25-2-316(2), and the warranty does not mention merchantability." Appellants' brief at 32. However, as the district court correctly determined, Miller's disclaimer did not need to meet § 25-2-316(2)'s requirements to be effective. That section concerns only attempts to "exclude or modify the implied warranty of merchantability or any part of it." Here, what Miller limited by disclaiming consequential damages was not the warranty, but the remedy for a breach of the warranty. North Carolina Code section 25-2-316(4) plainly provides that "[r]emedies for breach of warranty can be limited in accordance with . . . [N.C. Gen. Stat. §§] 25-2-718 and 25-2-719." N.C. Gen. Stat. § 25-2-316(4) (emphasis added). Section 25-2-719, in turn, provides that "[c]onsequential damages may be limited or excluded unless the limitation or exclusion is unconscionable." Thus, so long as the limitation is not unconscionable, it is valid. See Billings v. Joseph Harris Co., 220 S.E.2d 361, 366 (N.C. Ct. App. 1975).

Farrar argues that the limitation is unconscionable for two reasons. First, it contends that Farrar had no meaningful choice regarding the terms of the warranty. In this regard, Farrar contends that "when a manufacturer is aware that its product is inherently defective, but the buyer has 'no notice of [or] ability to detect' the problem, there is perforce a substantial disparity in the parties' relative bargaining

18

power." Appellants' brief at 37 (quoting <u>Carlson v. General Motors Corp.</u>, 883 F.2d 287, 296 (4th Cir. 1989)). Farrar maintains that, at the time it purchased the bags in question, Miller knew that Hyplast had changed the formula for the silage bags, while Farrar had no way of knowing that. That fact is certainly not much help to Farrar, however. When Farrar purchased bags in April 2005, Miller had no reason to believe that Hyplast would produce defective bags. And, it was shortly thereafter that several of the bags split. Although Miller learned that summer of other customers who had experienced problems with its bags, by that point, Farrar was certainly on notice of a possible problem as well. Thus, there was no substantial disparity in bargaining power between the parties, even regarding the August purchases.

Farrar also contends that Miller's consequential-damages exclusion was unconscionable because, with the exclusion, the terms of the purchase were unreasonably favorable to Miller. We do not agree. Any disclaimer of a customer's right to recover consequential damages as a warranty remedy can have significant effects, but in a transaction between business entities, a provision disclaiming consequential damages for commercial loss is not presumptively unconscionable. <u>See</u> N.C. Gen. Stat. § 25-2-719(3) (providing that limitation of consequential damages for commercial loss is not prima facie unconscionable); <u>Stan D.</u>

19

<u>Bowles Distrib. Co. v. Pabst Brewing Co.</u>, 317 S.E.2d 684, 690 (N.C. Ct. App. 1984) ("Courts rarely find limitation clauses in transactions between experienced businessmen unconscionable."); <u>Billings</u>, 220 S.E.2d at 366.

In its reply brief, Farrar argues for the first time that the exclusion of consequential damages was unconscionable because at least one of the replacement bags that Miller provided ended up breaking. Because Farrar did not make this argument in its initial brief, it is waived. See <u>Edwards</u>, 178 F.3d at 241 n.6; <u>Cavallo</u>, 100 F.3d at 1152 n.2. In any event, the consequential damages exclusion became effective when the bags were purchased. Subsequent events have no bearing on the issue of unconscionability. See <u>Weaver v. Saint Joseph of the Pines, Inc.</u>, 652 S.E.2d 701, 712 (N.C. Ct. App. 2007) ("The question of unconscionability is determined as of the date the contract was executed.").

For all of these reasons, we conclude as a matter of law that the consequential damages exclusion was valid and that the court properly granted summary judgment on Farrar's warranty claims.

## IV.

In sum, we affirm the district court's order granting summary judgment against Farrar.

<u>AFFIRMED</u>

20